

AFZA ANJUM, JANET TERRANA, VERONICA MONAHAN and CAMILLE FOREST, on behalf of themselves and all others similarly situated, Plaintiffs, - against - J.C. PENNEY COMPANY, INC., J.C. PENNEY CORPORATION, INC., Defendants.

13 CV 0460 (RJD) (RER)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

2014 U.S. Dist. LEXIS 144199

October 9, 2014, Decided
October 9, 2014, Filed

**COUNSEL:** [*1] For Afza Anjum, on behalf of themselves and all other similarly situated persons, Janet Terrana, on behalf of themselves and all other similarly situated persons, Veronica Monahan, on behalf of themselves and all other similarly situated persons, Camille Forest, on behalf of themselves and all other similarly situated persons, Plaintiffs: Brett Gallaway, Lee S. Shalov, LEAD ATTORNEYS, Wade Christopher Wilkinson, McLaughlin & Stern, LLP, New York, NY; Louis Ginsberg, LEAD ATTORNEY, Matthew Cohen, Law Firm of Louis Ginsberg, P.C., Roslyn, NY.

For Giovanni Villacis, Leroy Vincent, Alyssa Montalbano, Anna Maria DiMaio, Eugene Mak, Bashimel Maddox, Michael Pacelli, Erik Conkling, Palas Avi, Carmen Garcia, Christeline Fleming, Matthew Cocozziello, Christopher Perez, Elizabeth Lechner, Brendan Graves, Amy Membreno, Ivan Sergio Tello, Ashley Tamika Roye, Natalina Montuori, Joseph Anthony Castagliola, Alex Anthony Morales, Doreen Bruno, Willie Johnson, Hilda A. Adamitey, Christina L. Graffeo, Diane Graffeo, Thywill M. Avi, Michael Cacace, Lorraine Morales, Durania Limberis, Amanda Martie, Gail Joy Semkow, DeAnna Marie Olug, Donna Eileen Mahler, Tyrone M. Landrum, Daviana Nicholas-Gray, Matthew [*2] Morgan, Angela Thompson, Husny Zaher, Giovanna Santangelo, Vincent Sica, John Jr. Sica, Rebecca Hussain, Brittany Amber Fulton, Samantha DeAngelo, Maryann Peri, Christine Dirani, Diana Clementi, Melissa Davidson, Ashley Gilas, Michael Kingren, Plaintiffs: Lee S. Shalov, LEAD ATTORNEY, Wade Christopher Wilkinson, McLaughlin & Stern, LLP, New York, NY; Louis Ginsberg, Matthew Cohen, Law Firm of Louis Ginsberg, P.C., Roslyn, NY.

For J.C. Penney Company, Inc., J.C. Penney Corporation, Inc., Defendants: Jed L. Marcus, LEAD ATTORNEY, Tracey Salmon Smith, Bressler Amery & Ross P.C., Florham Park, NJ.

**JUDGES:** RAYMOND J. DEARIE, United States District Judge.

**OPINION BY:** RAYMOND J. DEARIE

**OPINION**

### MEMORANDUM OF DECISION

DEARIE, District Judge.

Sometimes surrender is the best option. Consider the convergence of the collective action provisions of the Fair Labor Standards Act of 1938 ("FLSA"), *29 U.S.C. §§ 201-219*, with the offer of judgment provision in *Federal Rule of Civil Procedure 68* and the "case" or "controversy" requirement of *Article III, § 2 of the Constitution*. The convergence of these provisions has given rise to an unusual litigation tactic, colorfully known as the "pick-off": a defendant seeking to avoid a lengthy and protracted FLSA collective action extends an offer of judgment to every plaintiff that [*3] fully satisfies their claims, thereby rendering the case moot under Arti-

cle III and divesting the court of subject-matter jurisdiction before the case ripens into a collective action. In other words, by conceding everything to the named plaintiffs, an FLSA defendant may avoid significant legal expenses and greater exposure.

Defendants J.C. Penney Company, Inc. and J.C. Penney Corporation, Inc. (collectively, "J.C. Penney") attempt to do just that. But the named plaintiffs rejected the offer and insist on continuing the fight, now joined by nearly fifty new plaintiffs seeking to opt into the suit pursuant to *28 U.S.C. § 216(b)*.

J.C. Penney has moved to dismiss under *Rule 12(b)(1)*. (Mot. Dismiss, ECF No. 97). The motion obliges the Court to engage with and answer a key question left open by the Supreme Court's decision in *Genesis Healthcare Corp. v. Symczyk, 133 S.Ct. 1523 (2013)* and related Second Circuit authority: when does an offer of judgment rejected by the named plaintiffs moot the lawsuit? The Court finds the answer in *McCauley v. Trans Union, L.L.C., 402 F.3d 340, 342 (2d Cir. 2005)* and *Cabala v. Crowley, 736 F.3d 226, 228 (2d Cir. 2013)* (per curiam), which direct the district courts to enter judgment despite the named plaintiffs' objections if the offer of judgment affords complete relief. The Court holds that the rejected offer of judgment moots the lawsuit only when the district [*4] court has entered that judgment -- or, to put it differently, that the judgment moots the lawsuit, not the offer. Consequently, when (as in this case) new collective action plaintiffs join the lawsuit before entry of judgment, the case is not moot. Accordingly, the Court denies the *Rule 12(b)(1)* motion.

The Court also considers defendant's motion to strike the consent notices filed by the putative opt-in plaintiffs, a motion that, as will be seen, is tangled up with defendants' *Rule 12(b)(1)* motion. (Mot. Strike, ECF No. 105). I deny that motion as well.

Finally, the Court considers defendant's *Rule 12(b)(6)* motion to dismiss the complaint for failure to state a claim, which is based primarily on the exacting pleading standard set forth in *Lundy v. Catholic Health System of Long Island Inc., 711 F.3d 106, 114-15 (2d Cir. 2013)*. The Court denies that motion in part and grants the motion in part, dismissing Veronica Monahan's overtime claims with leave to amend.

## BACKGROUND

The four named plaintiffs filed their initial complaint on January 25, 2013, on their own behalf and on behalf of all persons similarly situated. (ECF No. 1). In addition to their FLSA claims, the plaintiffs brought claims under various provisions of the New York Labor Law ("NYLL") and related state and federal regulations. After J.C. Penney proposed [*5] a motion to dismiss for failure to state a claim (Letter Req. Pre-Mot. Conf., ECF No. 9), I granted plaintiffs leave to amend their complaint. (Conf. Mins., ECF No. 14). Plaintiffs did so on May 9, 2013. (Am. Compl., ECF No. 15).

The amended complaint alleges that J.C. Penney's employees regularly worked before and after their scheduled shifts and during lunch breaks without receiving full compensation. Instead, according to plaintiffs, J.C. Penney engaged in three time-keeping practices that "systematically" undercounted their time. (Id. at ¶¶ 24-34). The first such practice is one commonly alleged in FLSA cases: that J.C. Penney would require its employees to work while off-the-clock. (Id. at ¶ 24). The other two practices consist of counting protocols built into J.C. Penney's time-keeping system. The Court will refer to the first of these counting protocols as the "rounding policy." (Id. at ¶ 25). I will refer to the second as the "lunch deduction." (Id. at ¶ 27).

The rounding policy cuts an employee's hours in small increments that add up to long stretches of time over days, weeks, and months. When commencing or stopping work, a J.C. Penney employee clocks-in and out by entering [*6] a seven-digit code into a machine. (Id. at ¶ 23). The time-keeping system is capable of counting the intervening time by minutes. (Id. at ¶ 25). However, for purposes of calculating pay, the system did not record a precise count of minutes. The system instead took the total minutes and then rounded down to some longer increment of time (perhaps down to the nearest tenth of an hour or nearest quarter of an hour -- the complaint does not specify). (Id.) By rounding down in this way, the time-keeping system undercounted an employee's actual time on-the-clock by "20 or more minutes per day." (Id.)

The lunch deduction further reduced that time by deducting "an hour for lunch even when employees were working in the store and did not clock out." (Id. at ¶ 27). I am not entirely sure what that terse allegation implies: that J.C. Penney would always deduct a full hour, ignoring whenever the employee actually clocked out for lunch (a rather incendiary claim), or that J.C. Penney would only deduct the full hour when an employee completely forgot to clock out (in effect assuming that the employee took a full hour when she might conceivably have taken less). In either case, the lunch deduction would [*7] inevitably undercount an employee's total hours unless discovered and corrected.

Citing J.C. Penney's time-keeping practices, Afza Anjum and Veronica Monahan bring claims under the FLSA, New York Labor Law ("NYLL"), and related regulations, including claims for overtime. (Id. at ¶¶ 57-68, 77-82). In contrast, Camille Forest and Janet Terrana -- both part-time workers -- bring causes of ac-

tion only under the NYLL and related state regulations, and make no claim for overtime. (Id. at ¶¶ 69-76). The plaintiffs have proceeded in this manner to comply with *Lundy, 711 F.3d at 116*, in which the Second Circuit held that the FLSA provides no remedy for non-payment of so-called "gap time."

Lundy also set forth a demanding pleading standard for FLSA overtime claims (which the Court will later examine at length). Accordingly, Anjum and Monahan have supported their overtime claims with estimates of how much unpaid time they accrued in a typical workweek. (Am. Compl. ¶¶ 7, 9). In its *Rule 12(b)(6)* motion, J.C. Penney argues that Anjum and Monahan's overtime allegations nevertheless fall short of the Lundy standard, and so I examine them in some detail. (Mem. Supp. Mot. Dismiss 13-17, ECF No. 97-2).

Anjum, as a full-time worker, was typically [*8] scheduled to work thirty-five to thirty-eight hours per week. (Am. Compl. at ¶¶ 7, 21). In total, she estimates that, "[d]uring any given week," she "worked at least 1 hour of uncompensated straight time and 15 -- 30 minutes of uncompensated overtime." (Id. at ¶ 7). Yet Anjum further supports that estimate with specific examples, alleging that "during any week of her employment," she "worked for at least 2 - 4 minutes without compensation prior to and after 2 - 3 of her shifts" and "worked during at least 2 - 3 meal breaks per week . . . for at least 10-15 minutes per meal break." (Id.). Using these examples, Anjum has thus estimated that she worked at most thirty-nine hours and nine minutes in a typical week. That is below (barely) the forty-hour threshold for an FLSA overtime claim, see *29 U.S.C. § 207*, and does not comport with her claim to have worked "15 - 30 minutes uncompensated overtime" in a "given" week. Unfortunately for Anjum, this is no idle discrepancy: the mismatched arithmetic undermines her position under Lundy.

Monahan's allegations exhibit the same problem. As a part-time worker, Monahan was typically scheduled to work twenty to twenty-four hours per week. (Id. at ¶¶ 9, 21). In total, she [*9] estimates that "during any given week," she "worked at least 10 hours of uncompensated straight time and 1.5 hours of uncompensated overtime." (Id. at ¶ 9). Like Anjum, Monahan supports this general estimate by breaking it down. Unlike Anjum, Monahan relies on a single week, November 14, 2011 through November 18, 2011. (Id.) During that week, she "worked for at least two hours without compensation after all 5 of her shifts," "was subject to at least 20 minutes of uncompensated time rounding" and "worked during 3 - 5 meal breaks ... for at least 20 minutes per meal break." (Id.) That totals at most thirty-six hours. Thus, as with Anjum, Monahan's general estimate clashes with her specific example.

And yet, surprisingly, Monahan seems to have made out a perfectly good minimum wage claim. She alleges that she was paid $8.25 per hour. Accordingly, if she was paid for only twenty-four hours of work during the week of November 14, 2011 ($198.00 in total) and paid nothing for the additional twelve hours, her effective wage rate was $5.50 per hour -- a minimum wage violation. See *29 U.S.C. § 207*; *Lundy, 711 F.3d at 116* (citing *United States v. Klinghoffer Bros. Realty Corp., 285 F.2d 487, 494 (2d Cir. 1960))*. The Court will return to that point in the analysis of the motion to dismiss. I will also address the [*10] question of what to make of Monahan's deposition testimony, in which she explained that she actually worked "1.5 hours of uncompensated overtime" during the week of Thanksgiving, which includes the shopping quasi-holiday known as "Black Friday" (that is, the week of November 21, 2011, not November 14, 2011). (Monahan Dep. 77-78, Docketed at Wilkinson Decl. Ex H, ECF No. 116-8).

After plaintiffs filed the amended complaint, J.C. Penney initiated the pick-off, extending an offer of judgment to each of the four named plaintiffs on May 21, 2013. (Marcus Deel. Exs. 1-4, ECF No. 97-3). J.C. Penney's offer was quite precise and purported to extend complete relief to all four named plaintiffs, specifically a sum certain "inclusive of all damages, liquidated damages, and interest" and "reasonable attorneys' fees, costs, and expenses" to be determined by the Court. (Marcus Deel. Ex. 1, at 1). J.C. Penney calculated the sum certain by assuming the truth of each plaintiff's estimates of her lost straight time and overtime. J.C. Penney further assumed that its alleged violations were willful.[1] (Id. at 2).

> 1 Of course, J.C. Penney concedes neither liability nor willfulness, but put these assumptions in place [*11] to ensure that it offered plaintiffs everything they could recover if the case went to a jury.

With those assumptions in place, J.C. Penney then calculated what it called the "damages period" -- the length of time that each plaintiff worked for J.C. Penney during the six-year limitations period for NYLL actions. J.C. Penney then combined all of plaintiffs' alleged unpaid straight time and overtime wages accruing within the damages period to calculate each plaintiff's actual damages. J.C. Penney then added liquidated damages under the FLSA, in an amount equal to 100% of actual damages. See *29 U.S.C. §§ 216(b), 260*. The offer only included liquidated damages for unpaid straight time and overtime wages that accrued during the FLSA's three-year limitations period for willful violations, not the full six-year limitations period set forth in NYLL (the Court will refer to this as the "FLSA damages period").

This methodology is basically sound and is best illustrated by the offer letters J.C. Penney issued to each named plaintiff.[2] But the Court draws attention to three possible flaws. First, J.C. Penney established the damages period and FLSA damages period by counting backward from February 1, 2013 to February 1, [*12] 2010, even though the plaintiffs filed the complaint on January 25, 2013, and even though wage claims accrue on the last day of the pay period in which a violation occurs. See *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 198 (2d Cir. 2013) ("The cause of action for FLSA and NYLL claims accrues on the next regular payday following the work period when services are rendered."). Thus, under the FLSA, instead of offering liquidated damages for any alleged violations that occurred after February 1, 2010, J.C. Penney should have included liquidated damages for any violations that occurred after January 25, 2010 (the complaint minus three years), and perhaps even offered liquidated damages for violations that occurred before January 25, 2010, if those violations occurred during a pay period ending after that date. The difference is trifling -- one week, maybe two, possibly zero. But it nevertheless raises doubts about the adequacy of the offer. And a similar problem arises with the calculation of the damages period under the NYLL -- J.C. Penney should have counted back to January 25, 2007, not February 1, 2007.

  2   The Court briefly paraphrases Anjum's offer letter to demonstrate. (Marcus Deel. Ex. 1, at 1-2). The letter opens by noting that Anjum worked for [*13] J.C. Penney from September 13, 2003 (well outside the six-year limitations period) through November 11, 2012. J.C. Penney then counted the total weeks Anjum worked within the six-year and three-year limitations periods, reaching a figure of 302 weeks for the damages period under the NYLL and 145 weeks for the FLSA damages period. Noting that Anjum worked at a regular rate of $10.65 per hour and an overtime rate of $15.98 per hour, then using her estimate of one hour of uncompensated straight time and thirty minutes of uncompensated overtime each week, J.C. Penney then computed her losses:

   Unpaid straight time: 1 hour @ $10.65/hour x 302 weeks= $3,216.30

   Unpaid overtime: 30 mins. @ $15.98/hour x 302 weeks= $2,412.98

   J.C. Penney then calculated FLSA liquidated damages for three years of overtime and straight time:

   Unpaid overtime: 30 mins. @ $15.98/hour x 145 weeks= $1,158.55

   Unpaid straight time: 1 hour @ $10.65/hour x 145 weeks= $1,544.25

   The offer thus totaled $8,332.08.

Second, J.C. Penney included only one award, equaling 100% liquidated damages, for both the FLSA and NYLL claims, not two separate awards of 100% (for the FLSA violations) and 25% (for the NYLL violations).[3] That may well [*14] be the correct approach: the district courts in this Circuit have disagreed on whether a plaintiff may recover liquidated damages for NYLL violations in addition to liquidated damages under the FLSA. See generally *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 91 (E.D.N.Y. 2012). The issue centers on whether the NYLL liquidated damages provision is compensatory (in which case plaintiff would reap an impermissible double recovery if she received an award of such damages after already receiving an award of liquidated damages under the FLSA) or punitive (in which case such damages would not constitute a windfall). See id.; *Wicaksono v. XYZ 48 Corp.*, No. 10-CV-3635, 2011 WL 2022644, at* 7-8 (S.D.N.Y. May 2, 2011).

  3   As amended, effective April 25, 2011, the NYLL now provides for an award of 100% liquidated damages. *N.Y. Lab. Law § 198(1-a)*.

Third, J.C. Penney did not include a separate award of pre-judgment interest. True, the offers purport to be "inclusive of all . . . interest." (Marcus Deel. Ex. 1, at 1). But, as the Court has just summarized, the sum certain in each offer includes straight time, overtime and liquidated damages. There is no separate calculation of interest. Moreover, the terms of the offer do not make clear that such interest is to be calculated by the Court. On the contrary, the term "inclusive of all . . . interest" plainly (but mistakenly) indicates [*15] that the sum certain is meant to include prejudgment interest. Again, this is not necessarily an error. As with the long-running debate over stacking NYLL and FLSA liquidated damages, the courts have disagreed over whether it is appropriate to award pre-judgment interest after awarding liquidated damages -- the question again comes down to whether NYLL liquidated damages are punitive or compensatory. See *Gunawan*, 897 F. Supp. 2d at 92; compare *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1064 (2d Cir. 1988) ("It is well settled that in an action for violations of the

Case 7:13-cv-08658-NSR-LMS   Document 47-1   Filed 10/14/14   Page 5 of 13

Page 5
2014 U.S. Dist. LEXIS 144199, *

Fair Labor Standards Act prejudgment interest may not be awarded in addition to liquidated damages. Among other purposes, [FLSA] liquidated damages compensate for the delay in receiving wages that should have been paid.") with *Reilly v. Natwest Mkts. Grp. Inc., 181 F.3d 253, 265 (2d Cir. 1999)* ("[B]ecause liquidated damages under the [NYLL] and pre-judgment interest serve fundamentally different purposes, on remand the district court shall award [plaintiff] pre-judgment interest."). But, again, the issue raises doubt over the adequacy of the offer.

After receiving the offers of judgment, plaintiffs interposed a motion for conditional certification of the prospective FLSA collective class. (Mot. Certify Class, ECF No. 18); Cf. *Ritz v. Mike Rory Corp., 959 F. Supp. 2d 276, 280 (E.D.N.Y. 2013)* ("[E]ven if an offer of judgment to a plaintiff is comprehensive and [*16] undisputed, courts will not dismiss the case as moot if there is a pending motion for conditional certification . . . ."). A day later, plaintiffs rejected the *Rule 68* offer in writing. (Marcus Decl. Ex. 5).

Over the next several weeks, the parties engaged in a lengthy bout of motions, counter-motions, and related filings, all designed to strengthen their respective position on the question of whether J.C. Penney had successfully mooted the lawsuit. J.C. Penney requested a pre-motion conference on the present *Rule 12(b)(1)* and *Rule 12(b)(6)* motions on June 10, 2013. (ECF No. 22). In response, on June 20th, the first five of approximately fifty would-be collective action plaintiffs filed opt-in consent forms through the named plaintiffs' attorneys, thus signaling their intent to join the action pursuant to *29 U.S.C. § 216(b)*. Cf. *Ritz, 959 F. Supp. 2d at 280* ("[E]ven if an offer of judgment to a plaintiff is comprehensive and undisputed, courts will not dismiss the case as moot if . . . additional individuals have opted in the litigation."). By August 6th, J.C. Penney had responded in kind, proposing a motion to strike these opt-ins on the grounds that the named plaintiffs improperly solicited the forms without supervision of court and without following FLSA collective [*17] action notice procedures. (ECF No. 81). In striking the opt-in forms -- and thus effectively dismissing the opt-in plaintiffs from the case without prejudice -- J.C. Penney hoped to defeat plaintiffs' anticipated argument that its failure to offer relief to the opt-in plaintiffs preserved the case. (Mem. Supp. Mot. Dismiss, at 12). Limited discovery moved forward, all motions were fully briefed, the Court held argument on the *Rule 12* motions on February 14th, and I have decided three of the four motions.

## ANALYSIS

*Article III § 2 of the Constitution* extends the "power" of the federal courts to "cases" or "controversies." In the constitutional sense, the words "case" or "controversy" carry specialized meaning, encompassing technical doctrines such as standing, mootness, and ripeness. Standing refers to the requirement that a plaintiff in federal court suffer a non-speculative injury-in-fact, traceable to the conduct of the defendant, and capable of redress by a favorable decision. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)*. Mootness, a closely related doctrine, forecloses the court's continued jurisdiction over a case when the plaintiff has received all the remedy to which it is entitled, because a plaintiff must maintain a "personal stake" in the case at all times. See [*18] *U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 396 (1980)*. That requirement -- a personal interest or stake, extant at all times -- has led the Court to characterize mootness as the doctrine of standing persisting through time. *Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997)*. Accordingly, when whatever injury-in-fact the plaintiffs seek to redress is in fact redressed at some point during the pendency of the action, the case is ordinarily rendered moot. See *Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477-78 (1990)*; *Sosna v. Iowa, 419 U.S. 393, 398-99 (1975)*. As such, a party's "demand for vindication" does not preserve subject-matter jurisdiction after that party's injury has been satisfied. *Wyoming v. U.S. Dep't of Interior, 587 F.3d 1245, 1250 (10th Cir. 2009)*. The courts are in the business of remedy, not reprisal.

Applying these principles, the Second Circuit first held in *Abrams v. Interco Inc., 719 F.2d 23, 31-34 (2d Cir. 1983)* that a defendant's tender of everything the plaintiff could conceivably recover in a lawsuit will render the lawsuit moot, even if the plaintiff insists on maintaining the action. The Second Circuit further developed that rule in *McCauley, 402 F.3d at 341-42* and *Cabala, 736 F.3d at 228-30*. And, although the Court has not been directed to any Second Circuit opinion expressly applying this rule in an FLSA collective action, the district courts within the Circuit have generally concluded that the rule does apply in such actions. See, e.g., *Ritz, 959 F. Supp. 2d at 280*; *Velasquez v. Digital Page, Inc., 842 F. Supp. 2d 486, 488 (E.D.N.Y. 2012)*; *Darbee v. Goodwill Indus. of Greater NY & N. NJ, Inc., 485 F. Supp. 2d 221, 223 (E.D.N.Y. 2007)*; Yeboah v. Cent. Parking Sys., No. 06-CV-0128, 2007 WL 3232509, at *3 (E.D.N.Y. Nov. 1, 2007) (Dearie, J.); Briggs v. Arthur T. Mott Real Estate LLC, No. 06-CV-0468, 2006 WL 3314624, at *2 (E.D.N.Y. Nov. 14, 2006); *Ward v. Bank of New York, 455 F. Supp. 2d 262, 267 (S.D.N.Y. 2006)*.

These cases thus provide the doctrinal basis for the pick-off play and therefore [*19] form the basis of J.C. Penney's *Rule 12(b)(1)* motion. But these cases also lay down important caveats, and these caveats form the basis of plaintiffs' opposition. Specifically, the plaintiffs raise

Case 7:13-cv-08658-NSR-LMS Document 47-1 Filed 10/14/14 Page 6 of 13

Page 6
2014 U.S. Dist. LEXIS 144199, *

four primary theories as to why the lawsuit remains a justiciable controversy: (1) the pick-off play is disfavored as a matter of public policy; (2) an FLSA case cannot be mooted if a motion for conditional certification is pending (even where, as here, the plaintiffs filed the motion after rejecting the offer); (3) J.C. Penney's offer did not in fact extend all the relief the plaintiffs could possibly recover in the lawsuit; and (4) the presence of opt-in plaintiffs with unsatisfied claims preserves the controversy. The Court addresses the first two points, which do not persuade, before addressing the last point, which does.

A substantial line of authority supports plaintiffs' first theory, expressing concern that the pick-off play fits uneasily with public policy, specifically the FLSA's authorization of collective action proceedings as a means to ensure fair compensation for all affected employees. See Yeboah, 2007 WL 3232509, at *3. Authority also supports plaintiffs' second theory, concluding that the pick-off play cannot moot [*20] a lawsuit if a motion for conditional certification is pending, even if no opt-in plaintiff has yet joined. See Velasquez, 842 F. Supp. 2d at 488. Courts expressing reluctance to dismiss an FLSA collective action as moot often find additional support in Deposit Guaranty National Bank v. Roper, 445 U.S. 326 (1980), a Rule 23 class action in which the Supreme Court expressed concerns that the pick-off maneuver frustrates the objectives of class actions. See Bowens v. Atl. Maint. Corp., 546 F. Supp. 2d 55, 77-78 (E.D.N.Y. 2008); Yeboah, 2007 WL 3232509, at *3. Similarly, courts have invoked the so-called relation back doctrine, under which the grant of class certification operates nunc pro tunc from the date of complaint, such that any event occurring in the interim that moots the named plaintiffs' claims does not moot the entire lawsuit. See Ward, 455 F. Supp. 2d at 268 (citing Weiss v. Regal Collections, 385 F.3d 337, 342, 347-48 (3d Cir.2004)). Other cases reason, sensibly, that the courts should refrain from dismissing a Rule 23 class action as moot until the plaintiff has an adequate amount of time to move for class certification -- even when the offer is plainly sufficient -- in order to forestall future "'race[s] to the courthouse between defendants armed with uninformed offers and plaintiffs with under-researched certification motions.'" Thomas v. Am. Serv. Fin. Corp., 966 F. Supp. 2d 82, 93 (E.D.N.Y. 2013) (quoting McDowall v. Cogan, 216 F.R.D. 46, 51 (E.D.N.Y. 2003)).

Likewise, there is wide agreement that the offer must extend complete relief and that complete relief must be extended to every plaintiff [*21] in the lawsuit, including opt-in plaintiffs. See, e.g., Ward, 455 F. Supp. 2d at 268. That rule is difficult to quarrel with, because a case is moot only when no controversy persists, and one cannot say that the controversy has abated when even one unsatisfied claim for damages by a single plaintiff persists.

In short, plaintiffs' objections can -- and, in this Circuit, very often have -- defeated Rule 12(b)(1) motions such as J.C. Penney's. The problem for plaintiffs, as J.C. Penney rightly points out, is that not all of the cases on which plaintiffs rely have survived Genesis Healthcare. In that case, the Supreme Court addressed a split among the Circuits, some of which had taken a much more critical view of the idea that an unaccepted offer of judgment can moot a controversy within the meaning of Article III. Genesis Healthcare, 133 S.Ct. at 1528. Ultimately, Genesis Healthcare provided no resolution to this split, because the plaintiffs had failed to bring a cross-petition challenging the Third Circuit's determination that the defendant's Rule 68 offer had mooted each of their individual claims. Id. at 1529. With that crucial concession in place, the case presented no opportunity for the Court to address the fundamental question of whether -- or, crucially, when -- an unaccepted [*22] Rule 68 offer moots a case or controversy. See id.

And yet Genesis Healthcare is much more consequential than it might initially appear, at least here in the Second Circuit. For in rejecting various objections to its "straightforward application of well-settled mootness principles," id. at 1529, the Court implicitly overruled some of the district court decisions I have just identified, including (at least in part) my own decision in Yeboah. Id. at 1530-32.

First, Genesis Healthcare emphatically rejected two express exceptions to mootness that the Court had previously carved out in the context of Rule 23 class actions, including the relation back doctrine. Id. at 1528, 1530. As the Court explained, the relation back doctrine cannot apply in an FLSA collective action because a Rule 23 class has independent legal status, whereas an FLSA collective class does not: "[t]he sole consequence of conditional certification is the sending of court-approved written notice to employees, who in turn become parties to a collective action only by filing written consent with the court." Id. at 1530 (citations omitted). In other words, 29 U.S.C. § 216(b) does not truly authorize a class action: it is properly viewed as a rule of joinder under which only the individual opt-in plaintiffs have legal [*23] status, not the aggregate class of aggrieved employees. Cf. Myers v. Hertz Corp., 624 F.3d 537, 555 n.10 (2d Cir. 2010).

Second, Genesis Healthcare strongly implied that broader policy-based objections simply will not revive an otherwise moot lawsuit after the named plaintiffs' claims have been satisfied. Genesis Healthcare, 133 S.Ct at 1531-32. The Court declined to carve out an exception to mootness based on concerns, expressed most prominent-

ly in Roper, that the pick-off maneuver "'frustrate[s] the objectives of class actions.'" *Id. at 1532* (quoting *Roper, 445 U.S. at 339*). The Court dismissed that language as dicta, because Roper ultimately turned on the fact that class certification allows a plaintiff to shift the fees and costs of litigation to class members (it affects, in other words, the value of the named plaintiff's stake in the lawsuit). Id. The Court further explained that this dicta was, in any event, "tethered to the unique significance of certification decisions in class-action proceedings," not FLSA collective actions. Id. Accordingly, asked to reject the use of the pick-off maneuver to advance "the purposes served by the FLSA's collective-action provisions -- for example, efficient resolution of common claims and lower individual costs associated with litigation," the Court declined. *Id. at 1531*.

Genesis Healthcare [*24] thus significantly alters the application of Article III mootness in the context of a *Rule 68* offer. As this Court has noted, plaintiffs rely heavily on decisions that have limited the application of Abrams in FLSA cases by invoking the relation back doctrine or carving out various policy exceptions. The viability of those cases is now in doubt.

That brings the Court to an important juncture. As I have already noted, close to fifty putative opt-in plaintiffs filed written consent forms with the Court seeking to join this collective action. These opt-in plaintiffs did so after J.C. Penney extended the offer and the named plaintiffs rejected it. That sequence of events leads to the central question: assuming that J.C. Penney's offer afforded complete relief (an assumption the Court calls into question), when does an offer of complete relief moot the individual claims of the named plaintiffs, such that no controversy remains and the court loses jurisdiction? As *Ritz, 959 F. Supp. 2d at 279* quite rightly pointed out, "Genesis explicitly left unresolved" that "fundamental" question.[4] To answer it, the Court must turn to the law of the Circuit. See id.

> 4  *Ritz, 959 F. Supp. 2d at 279* answered that question by holding that the case does not become moot until [*25] the named plaintiff has a "reasonable" opportunity to move for conditional certification. That approach strikes the Court as eminently sensible policy, but seems difficult to reconcile with Genesis Healthcare's conclusion that only individual plaintiffs have legal status in an FLSA action. In light of that rule, the presence or absence of a motion for conditional certification appears to have little bearing on whether the case is moot, regardless of when the motion is filed, because the district court's eventual grant of a motion for conditional certification does not create an entity that can be said to have its own stake in the lawsuit. Only the joinder of an opt-in plaintiff -- not the pleading of a collective action and not the certification of a collective class -- adds a party with an independent stake in the outcome. Cf. *Louisdor v. Am. Telecomm., Inc., 540 F. Supp. 2d 368, 373 (E.D.N.Y. 2008)* ("Plaintiff has no right to represent any other individuals unless they opt in to the action."). Accordingly, although in certain cases it may make sense to let the plaintiffs seek out such allies, even after the plaintiff received an offer of complete relief, the Court is hard-pressed to say that anyone still has a stake in the outcome while the process of conditional [*26] certification unfolds -- unless judgment has yet to be entered, as I will explain shortly.

The Court begins with a closer look at *Abrams, 719 F.2d at 25*, in which the plaintiff -- seeking treble damages and proceeding on behalf of a putative class -- alleged a price-fixing scheme in which the defendant charged more than the fair market rate for clothing. After defeating a motion for class certification, the defendant "tendered three times the amount of plaintiffs' purchases and agreed to pay reasonable attorneys' fees." Id. Plaintiff rejected the offer, but conceded that it afforded him everything he could possibly recover, given that the measure of his damages was "not . . . a refund of three times what [plaintiffs] paid but rather three times the amount by which such payment exceeded the prices that would have prevailed in a free market." *Id. at 31*. After defendants moved to dismiss under *Rule 12(b)(1)*, the district court ordered the parties to settle a judgment, then entered judgment dismissing the case for lack of a justiciable controversy, while expressly reserving plaintiff's right to seek appellate review on the issue of class certification. Id.

The Second Circuit affirmed. *Id. at 34*. Invoking Roper, the court first noted that [*27] the potential for class certification precludes a determination of mootness, because (as Genesis Healthcare also explained) class certification allows a class representative to shift the costs of litigation to other class members. See *id. at 32*. But once the Second Circuit upheld the district court's denial of class certification, "[p]laintiffs' interest in shifting part of the costs . . . [had] been terminated" and the offer of complete relief rendered the case moot. Id. The court closed by explaining that "[t]he case would thus seem to have become the hypothetical described in Roper, to wit, a 'final judgment fully satisfying named plaintiffs' private substantive claims.'" Id. (citations omitted). This notion -- that the "final judgment" satisfies the claims, not the offer itself -- persisted though later cases and informs our holding here.

McCauley and Cabala refined the doctrine first sketched out in Abrams. In *McCauley, 402 F.3d at 341*, the plaintiff rejected a *Rule 68* offer that the district court later determined afforded complete relief on his claims. The district court thus dismissed the lawsuit as moot without entering judgment. Id. On appeal, the Second Circuit vacated and remanded. Following the lead of the Seventh Circuit in *Chathas v. Local 134 IBEW, 233 F.3d 508, 512 (7th Cir. 2000)* [*28], the McCauley court held that if a plaintiff rejects an offer of complete relief, the district court should not dismiss the action outright. *McCauley, 402 F.3d at 342*. Rather, over the plaintiff's objections, the district court should enter what the court called a "default judgment" against the defendant on the terms set forth in the offer. Id. The Second Circuit reasoned that it is the entry of judgment that extinguishes the live controversy, not the offer itself, explaining that "in the absence of an obligation to pay [damages] the controversy between [plaintiff] and [defendant] is still alive." Id.

*Cabala, 736 F.3d at 230*, then reiterated the key point that the entry of judgment moots the claim, not the extension of the offer. In Cabala, the plaintiff had recovered $1,000 and an award of attorney fees. *Id. at 227*. The defendant appealed the fee award, arguing that a $1,000 settlement offer he made early in the proceedings had mooted the case, thus precluding the award. Id. That settlement offer equaled the maximum statutory damages recoverable under the Fair Debt Collections Practices Act ("FDCPA") -- in other words, the proposed settlement afforded complete relief. *Id. at 227-28*. But the settlement offer did not consent to entry of judgment. Id. Thus the Second Circuit affirmed, holding that it is not merely an offer of complete relief, but the consent to judgment on terms affording complete relief that renders a controversy moot. *Id. at 228*. And, as the court explained: "[t]he typically proper disposition in such a situation is for the district court to enter judgment against the defendant for the proffered amount and to direct payment to the plaintiff consistent with the offer. Only after such a disposition is the controversy resolved such that the court lacks further jurisdiction." Id. (emphasis added).

The [*29] logic of McCauley and Cabala thus compels the conclusion that an offer of judgment affording complete relief does not extinguish the live controversy unless and until the court actually enters judgment over the plaintiff's objections. It could hardly be otherwise, because a district court stripped of its jurisdiction cannot enter judgment. Accord *Moreira v. Sherwood Landscaping Inc., No. 13-CV-2640, 2014 WL 4639126, at *4 (E.D.N.Y. Sep. 16, 2014)*. ("[T]he Court has not entered judgment against Defendants. Thus, the unaccepted offers of judgment alone did not divest this Court of subject matter jurisdiction."). Without jurisdiction, the district court cannot impose the obligation to pay damages that, according to McCauley, extinguishes the controversy, nor achieve the disposition that, according to Cabala, resolves the controversy such that the court loses jurisdiction. Thus an unaccepted *Rule 68* offer cannot by itself moot a claim, not if the courts are to follow McCauley.[5]

> 5   That conclusion precludes J.C. Penney's resort to the Seventh Circuit's decision in *Damasco v. Clearwire Com., 662 F.3d 891, 895 (7th Cir. 2011)*, which appears irreconcilable with both McCauley and Chathas (the Seventh Circuit decision from which McCauley drew inspiration). By affirming the district court's dismissal of the case without granting any relief, *Damasco, 662 F.3d at 893* effectively assumed (but [*30] did not squarely hold) that an offer of complete relief moots the claim the instant the defendant extends the offer. On the other hand, in *Chathas, 233 F.3d at 511*, the district court had granted the relief specified in the *Rule 68* offer (in that case, a permanent injunction) before dismissing the case. Damasco thus clashes with Chathas and (more importantly) McCauley because, again, a district court cannot enter relief if it has already lost subject-matter jurisdiction over the case.

Furthermore, by calling upon the district courts to enter judgment only if the offer affords complete relief, McCauley requires the Court to adjudicate the often close and difficult question of just how much a named plaintiff is entitled to recover. Some offers might be so obviously sufficient that they do not really raise the question in the first place, as in Abrams. But many offers will call for closer scrutiny to determine whether they afford complete relief. And, in applying that scrutiny, the Court directly determines the value of the plaintiff's stake in the lawsuit. More precisely, the Court determines the maximum possible value of that stake, and then determines whether the offer meets or exceeds that maximum. While the value [*31] of the plaintiffs stake remains a contested question, it is hard to see how the underlying controversy can be considered dead. See *Rubery v. Buth-Na-Bodhaige, Inc., 494 F. Supp. 2d 178, 180 (W.D.N.Y. 2007)* (concluding that the offer does not moot the claim when its sufficiency is disputed).

Such is the case here. As set forth earlier, the methodology J.C. Penney used to calculate the value of its *Rule 68* offers is well-researched and basically sound, yet I am not entirely confident that J.C. Penney afforded all of the remedy to which the named plaintiffs are entitled. The Court's preliminary conclusion is that the offer affords everything plaintiffs could recover under the FLSA but falls short under the NYLL (which in turn raises the

Case 7:13-cv-08658-NSR-LMS Document 47-1 Filed 10/14/14 Page 9 of 13

Page 9
2014 U.S. Dist. LEXIS 144199, *

interesting question of what to do when an offer of judgment moots the federal claims in a lawsuit but does not moot pendent state claims). Supplemental briefing could easily resolve those doubts and allow the Court to determine conclusively whether the offer is adequate. But the Court need not belabor the analysis: it seems to me that the mere existence of these issues and the consequent need for court adjudication of the maximum value of each plaintiff's stake in the lawsuit forecloses the possibility that the *Rule 68* offer extinguished [*32] this controversy at the time J.C. Penney made the offer.

Naturally the Court is aware that this approach limits the efficacy of the pick-off play. But, in addition to thinking McCauley and Cabala compel the result, the Court also thinks this approach preserves a suitable measure of discretion for the district courts. In some circumstances, a court may well enter judgment soon after the defendant executes the pick-off play, particularly where the offer is plainly sufficient, as in Abrams, or where a long stretch of time has already passed since the plaintiffs filed their complaint. See *Darboe, 485 F. Supp. 2d at 223*. In other situations, a court may deem it appropriate to follow *Ritz, 959 F. Supp. 2d at 279* using the space between the offer of judgment and the entry of judgment to afford the named plaintiffs a "reasonable opportunity" to seek conditional certification. See also *Bowens, 546 F. Supp. 2d at 77*. In light of the Supreme Court's view of mootness as a "flexible" doctrine, the Court thinks such discretion is appropriate. *Geraghty, 445 U.S. at 400*.

One last question remains before the Court may resolve the *Rule 12(b)(1)* motion, though the motion itself did not directly raise it: whether the putative opt-in plaintiffs are parties to the action. The putative opt-ins (none of whom have received a *Rule 68* offer) [*33] joined the action long before the Court could feasibly have entered judgment. Indeed, counsel filed the first written consent notices before the Court could even hear a pre-motion conference on J.C. Penney's motion. Under the holding I have just reached -- that a rejected offer of complete relief moots a lawsuit only when the district court enters judgment over the plaintiff's objections -- the presence of the opt-in plaintiffs with unsatisfied claims would thus preclude a determination of mootness. But J.C. Penney -- anticipating, as did plaintiffs, that the presence of opt-in plaintiffs might be the determining factor in the motion -- has moved to strike the opt-in plaintiffs from the action. I had earlier referred that motion to Judge Reyes, but vacated that referral because the resolution of the motion strike has potentially dispositive consequences on the *Rule 12(b)(1)* motion.

Fundamentally, J.C. Penney contends that a would-be plaintiff cannot opt in unless the named plaintiffs have followed the process of conditional certification under the court's supervision. In making this argument, J.C. Penney has advanced several good reasons for the district courts to exercise close supervision over that [*34] process and argues that plaintiffs have usurped the Court's role by improperly soliciting the opt-in plaintiffs. See generally *Woods v. New York Life Ins. Co., 686 F.2d 578, 580-82 (7th Cir. 1982)*. But I am not persuaded on its primary point. Rather, the Court concludes that, because conditional certification is not obligatory in an FLSA action, a district court has no authority to summarily bar a plaintiff from opting into the lawsuit on account of some defect in conditional certification -- including supposed improper solicitation -- so long as the opt-in plaintiff has satisfied the written notice requirements of *29 U.S.C. § 216(b)*.

In reaching this conclusion, the Court need not look much further than the language of Section 216(b) itself, which provides in relevant part:

> An action to recover the liability prescribed in [the minimum wage, overtime, and retaliation provisions of the FLSA] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which [*35] such action is brought.

Thus the FLSA, standing alone, creates a relatively simple rule of joinder. See *Myers, 624 F.3d at 555*. The would-be opt-in files written consent. He or she becomes party to the lawsuit through a separate action joined to the original suit, which commences on the date written consent is filed. *29 U.S.C. § 256(b)*. That is precisely why Genesis Healthcare concluded that, despite the nomenclature, there is no thing as a "class" in an FLSA action, not in the way the courts define that term under Rule 23. *Genesis Healthcare, 133 S.Ct. at 1530*. Instead, the FLSA collective action consists of a group of similarly situated plaintiffs, who become parties -- that is, commence their action -- as soon as they file written consent. *29 U.S.C. § 256(b)*

Moreover, *Section 216(b)*'s corollary -- conditional certification -- does not in our view create an additional procedural impediment to the would-be opt-in plaintiff. No provision of the FLSA itself prescribes or even authorizes conditional certification. Rather, the courts de-

veloped the notion, reasoning that conditional certification procedures provide an efficient means of administering the FLSA's opt-in joinder rule. *Myers, 624 F.3d at 555*. Many courts found the practice controversial -- and not without reason -- concluding that the courts had no business putting [*36] themselves in a position where they might "stir up" a lawsuit or impliedly endorse its merits. See *Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 167 n.1 (1989)* (noting circuit split). That view has steadily lost ground, but these concerns have nonetheless kept most courts from holding that conditional certification is obligatory -- and Myers expressly states that FLSA imposes no such requirement. *Myers, 624 F.3d at 555*. As such, conditional certification is best considered "judicial gloss" on the straightforward rule of opt-in joinder set forth in the statute. *Symczyk v. Genesis HealthCare Corp., 656 F.3d 189, 194 (3d Cir. 2011)* rev'd on other grounds *133 S. Ct. 1523 (2013)*. It is therefore an uneasy source of authority by which to banish plaintiffs who have complied with the letter of the statute. I therefore do not believe I have authority to strike the claims of any opt-in plaintiff in this case who has complied with the statute simply because the named plaintiffs did not seek conditional certification. Accord *Gonyer v. Vane Line Bunkering, Inc.,    F. Supp. 2d   , 2014 WL 3710144, at *1-2 (S.D.N.Y. July 25, 2014)*. But see, e.g., *Cintron v. Hershey Puerto Rico, 363 F. Supp. 2d 10, 18-19 (D.P.R. 2005)*.

In so concluding, the Court also takes due note of the virtual certainty that, should the Court strike the opt-in forms, the operation of the statute of limitations alone would subsequently defeat what might otherwise be perfectly valid FLSA wage claims. *29 U.S.C. §§ 255, 256*; see *Whitehorn v. Wolfgang's Steakhouse, Inc., 767 F. Supp. 2d 445, 449 (S.D.N.Y. 2011)* (filing of written consent does not relate back to date of complaint [*37] for statute of limitations purposes and equitable tolling is appropriate only in extraordinary circumstances); *Hosking v. New World Mortg., Inc., 602 F. Supp. 2d 441 (E.D.N.Y. 2009)* (statute of limitations ordinarily not tolled for opt-in plaintiffs). Thus, while J.C. Penney correctly states that the opt-in plaintiffs would remain free to commence their own lawsuit, I cannot agree that they would suffer no prejudice. They plainly would. Cf. *Nakahata, 723 F.3d at 199* (concluding that district court abused discretion in denying leave to amend defective overtime pleadings because "[p]laintiffs were prejudiced through lost causes of action resulting from the termination of the original complaints.").

And even if the named plaintiffs in this case had improperly solicited their former co-workers (I take no position), the Court sees neither fairness nor utility in penalizing the opt-in plaintiffs. Consequently, the Court further concludes that any adverse inference one might draw from the named plaintiffs' failure to produce the communications through which they improperly solicited the opt-in plaintiffs (according to J.C. Penney) does not provide reason to negate the opt-in plaintiffs' joinder. Whether improperly solicited or not, these plaintiffs have now unambiguously staked their claims. That [*38] is all *Section 216(b)* requires.

The Court does not mean to imply absolute comfort with this conclusion. There is indeed something disagreeable about a rule that (in effect, though not design) permits plaintiffs to "have their cake and eat it too" by seeking out fellow litigants without court supervision while also seeking the Court's assistance in soliciting yet more litigants. *Chemi v. Champion Mortg., No. 05-cv-1238, 2006 WL 7353427, at *10 (D.N.J. June 21, 2006)*. But I must demur from what I see as the overly harsh approach followed in, among others, *Cintron, 363 F. Supp. 2d at 18-19*. Even if the Court agreed with Cintron that Federal Rule of Civil Prqcedure 83 or Hoffman-Laroche vests the district court with discretion to abjure the rule of joinder laid out in the FLSA, see *id. at 15*, the Court would not exercise that discretion here. In managing the conduct of some undoubtedly unruly plaintiffs and attorneys, the Court nevertheless thinks that decision went a bit too far in dismissing the opt-in plaintiffs. *Id. at 19*.

Finally, the Court does not think that the statute of limitations issues J.C. Penney identifies in its opposition provide adequate grounds for striking the opt-in forms outright. Naturally the recovery of an individual plaintiff may well be circumscribed or eliminated entirely [*39] by application of that defense (which is, as I have just explained, a major reason I remain loathe to summarily strike the opt-ins). But the limitations period is a defense, after all, and not one typically well-suited to immediate disposition, unless the grounds for applying that defense are readily apparent from the allegations of the complaint itself. See, e.g., *Estate of Axelrod v. Flannery, 476 F. Supp. 2d 188, 203 (D. Conn. 2007)* (citing *Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 162 (2d Cir.1989))*. Here, the opt-in plaintiffs have joined an action in which the complaint alleges company-wide wage violations continuing up to and beyond the date of the complaint -- there is no basis to infer that the opt-ins have no claims within the limitations period whatsoever. Likewise, the lack of similar situation between the named plaintiffs and the individual opt-ins may well provide grounds to dismiss individual claims without prejudice. See, e.g., *Hinterberger v. Catholic Health Sys., 299 F.R.D. 22, 55 (W.D.N.Y. 2014)*. But this too is simply not an issue I can determine by reference to the consent forms alone. Rather, courts typically address the question of whether plaintiffs are similarly situated in the context of a motion to decertify. See, e.g., Johnson v. Wave Comm GR LLC,

F. Supp. 2d    , 2014 WL 988512, at *2 (N.D.N.Y. 2014) ("Courts in this Circuit apply a two-step method in certifying a FLSA collective action. . . . The second stage [,decertification,] occurs [*40] after discovery on a more developed record.").

The Court thus denies the motion to strike the opt-in consent forms. But I do so without prejudice to any future motion to dismiss the claims of an individual opt-in plaintiff or motion to decertify the class. Accordingly, with the opt-in plaintiffs now joined in the action, the Court has subject matter jurisdiction and the motion to dismiss pursuant to *Rule 12(b)(1)* is denied.

The Court now turns to J.C. Penney's motion to dismiss Anjum and Monahan's FLSA overtime causes of action for failure to state a claim (again, Terrana and Forest seek only gap time under the NYLL). In reviewing such motions, the Court asks whether the complaint pleads "enough facts to state a claim to relief that is plausible on its face." *Brown v. Daikin Am. Inc., 756 F.3d 219, 225 (2d Cir. 2014)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007))*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009))*. Here, the motion turns on the pleading standard set forth in a trio of Second Circuit cases applying *Iqbal and Twombly* to the FLSA: *Lundy, Nakahata and DeJesus v. HF Management Services, LLC, 726 F.3d 85 (2d Cir. 2013)*.

I first note that Anjum and Monahan's FLSA overtime claims are the only source of federal question jurisdiction in the lawsuit. [*41] See *28 U.S.C. § 1331*. In the ordinary course, once the district court has dismissed FLSA claims, the balance of factors governing the exercise of supplemental jurisdiction usually lead the district court to decline jurisdiction over pendent state law claims (though that decision remains a matter for the court's discretion). *Lundy, 711 F.3d at 117-18*; see also *Bustillos v. Acad. Bus, LLC, No. 13-CV-565, 2014 WL 116012, at *5 (S.D.N.Y. Jan. 13, 2014)*. Thus, if the Court dismissed Anjum and Monahan's FLSA overtime claims, the Court would likely dismiss the remaining claims without prejudice, leaving plaintiffs to bring those claims in state court.[6]

> 6   However, the Court would not dismiss without first giving plaintiffs the opportunity to show that the action meets the jurisdictional requirements of the Class Action Fairness Act of 2005 ("CAFA"). See *28 U.S.C. 1332(d)*.

In *Lundy, 711 F.3d at 110*, the court sustained the dismissal of a putative FLSA collective action and NYLL class action (along with badly misconceived claims under the Racketeer Influenced and Corrupt Organizations Act) while vacating the judgment to the extent it dismissed the NYLL gap-time claims with prejudice. The complaint alleged FLSA violations similar to those seen here: automatic deduction of meal breaks and uncompensated work before and after shifts. *Id. at 111*. In deciding whether the complaint [*42] stated "a plausible FLSA overtime claim," the court held that "a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours." *Id. at 114*. Although quite detailed, the complaint failed to meet this standard. As the court explained:

> [Plaintiff] was "typically" scheduled to work three shifts per week, totaling 37.5 hours. She "occasionally" worked an additional 12.5-hour shift or worked a slightly longer shift, but how occasionally or how long, she does not say; nor does she say that she was denied overtime pay in any such particular week. She alleges three types of uncompensated work: (1) 30-minute meal breaks which were "typically" missed or interrupted; (2) uncompensated time before and after her scheduled shifts, "typically" resulting in an additional 15 minutes per shift; and (3) trainings "such as" a monthly staff meeting, "typically" lasting 30 minutes, and respiratory therapy training consisting of, "on average," 10 hours per year.
>
> She has not alleged that she ever completely missed all three meal breaks in a week, or that she also worked a full 15 minutes of uncompensated time around every shift; but even if she [*43] did, she would have alleged a total 39 hours and 45 minutes worked. A monthly 30-minute staff meeting, an installment of the ten yearly hours of training, or an additional or longer shift could theoretically put her over the 40-hour mark in one or another unspecified week (or weeks); but her allegations supply nothing but low-octane fuel for speculation, not the plausible claim that is required.
>
> *Id. at 114-15* (citations omitted).

In short, Lundy turns on arithmetic: take the plaintiff's estimates of time worked and then add plaintiff's estimates of uncounted time to determine whether plaintiff

worked more than forty hours in any given work week. See *DeJesus, 726 F.3d at 88-89* ("The allegations in Lundy thus failed because of arithmetic: tallying the plausible factual allegations, we could not get beyond forty hours in any given week, and therefore to a plausible claim for overtime."). If not, dismiss. *Id. at 89*. The Second Circuit soon reiterated this standard again in *Nakahata, 723 F.3d at 200-02*, dismissing FLSA claims even less detailed than the complaint in Lundy before moving on to the question of whether a defendant can invoke a collective bargaining agreement at the pleading stage when moving to dismiss common law claims as preempted under the Labor [*44] Management Relations Act.

If Lundy and Nakahata were the final word on the subject, I would likely dismiss both Anjum and Monahan's FLSA overtime claims. To reiterate, both plaintiffs give general estimates of lost overtime, but the specific examples of lost time that each plaintiff attributes to off-the-clock work, the lunch deduction and the rounding policy do not add up to more than forty hours. Anjum, a full-time worker, specifically alleges just over thirty-nine hours. Monahan, a part-time worker, specifically alleges thirty-six hours. Accordingly, neither unambiguously states a claim for overtime violations under the Lundy court's exacting standard. And, without the FLSA claims furnishing a basis for subject matter jurisdiction, the Court would, in the ordinary course, decline to exercise supplemental jurisdiction over the pendent NYLL claims, dismissing those claims without prejudice unless the suit meets CAFA's jurisdictional requirements. See *28 U.S.C. § 1332(d)*; *Hart v. Rick's NY Cabaret Int'l, Inc., 967 F. Supp. 2d 955, 961 (S.D.N.Y. 2014)*.

But *DeJesus, 726 F.3d at 88-90*, tempers the force of Lundy just enough for plaintiffs to survive the motion (even though the court affirmed the district court's dismissal). In that case, the Second Circuit stepped back slightly from the Lundy court's apparent [*45] insistence that a complaint fails to state a claim whenever it fails to precisely allege missed time adding up to more than forty hours in a week. *Id. at 88*. The DeJesus court explained that, in truth, Lundy did not "make an approximation of overtime hours a necessity in all cases." *Id.* Rather, Lundy maintained "that an approximation 'may help draw a plaintiff's claim closer to plausibility.'" *Id.* (quotation omitted). Furthermore:

> Lundy's requirement that plaintiffs must allege overtime without compensation in a "given" workweek . . . was designed to require plaintiffs to provide some factual context that will "nudge" their claim "from conceivable to plausible." *Twombly, 550 U.S. at 570*. While this Court has not required plaintiffs to keep careful records and plead their hours with mathematical precision, we have recognized that it is employees' memory and experience that lead them to claim in federal court that they have been denied overtime in violation of the FLSA in the first place. Our standard requires that plaintiffs draw on those resources in providing complaints with sufficiently developed factual allegations.

*Id. at 90*.

Accordingly, DeJesus, though not a retreat from Lundy, nevertheless makes clear that Lundy ultimately [*46] did not impose a requirement of unforgiving mathematical rigor, so long as the plaintiff blends enough specific facts -- the hours worked, the hours paid, the rate of pay, the employment practices at issue, and so forth -- to make plausible the existence of at least one given work week of more than forty hours.

Here the Court must decide whether Anjum and Monahan have done that or whether, in the words of *Lundy, 711 F.3d at 115*, they have merely supplied "fuel for speculation." It is a close question. So close that the Court reaches a different result for each plaintiff. For Anjum, I think that her employment as a full-time worker (typically scheduled to work at most thirty-eight hours in a regular week) and the length of her tenure (six years in total, including three years within the FLSA limitations period for willful violations) makes it plausible that the three time-keeping practices alleged at length in the complaint could have converged at least once in a single given week to push Anjum's total hours from thirty-eight to more than forty, despite her failure to specifically identify a given week in which she worked more than forty hours. For instance, a single busy week over the course of three years [*47] in which Anjum worked off-the-clock after a shift for two hours would suffice. That is not an unduly speculative inference.

For Monahan, I think that her employment as a part-time worker (scheduled to work twenty-four hours in a regular week) and the short length of her tenure (two months) make it implausible that the time-keeping practices could have converged to push her total hours from twenty-four to more than forty during one of those weeks. In Monahan's case, the leap is just too speculative, unless she can identify a specific week in which she worked more than forty hours. She has not -- at least not in the complaint.

Monahan's deposition, however, tells a slightly different story: that she worked a week with one-and-a-half

hours overtime during the week of November 21, 2011 (not the week of November 14, 2011, as alleged in the complaint). Thanksgiving holiday fell during that week, as did its more frantic associate, Black Friday, a day well-known in the retail industry for long hours. And yet these are matters outside the pleadings, coupled with facts not judicially noticeable, which the Court cannot rely upon to deny the *Rule 12(b)(6)* motion without first converting it to a motion for summary [*48] judgment under *Rule 56*. See, e.g., *Chambers v. Time Warner, Inc., 282 F.3d 147, 154 (2d Cir. 2002)*. The Court is therefore constrained to grant the motion to dismiss Monahan's FLSA overtime claims: on its face, the complaint fails to state a plausible claim for relief. However, it would seem plausible that even a part-time employee like Monahan would work more than forty hours during that week, if she were to so allege. The Court therefore dismisses the overtime claims without prejudice, granting Monahan leave to amend the complaint within twenty-one days of this memorandum and order, but only to extent necessary to allege a work week of greater than forty hours. See *Special Situations Fund III OP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.,    F. Supp. 2d   , 2014 WL 3605540, at \*33-34 (S.D.N.Y. Jul. 21, 2014)* (dismissing, but granting leave to amend to cure specific deficiencies based on facts and inferences set forth in papers but not yet pled).[7]

[7] The Court realizes the typical procedure would be to await a formal motion from Monahan attaching a proposed amendment for examination, because ordinarily the "determination of futility [of an amendment] is subject to the same standards as a motion to dismiss under *Rule 12(b)(6) of the Federal Rules of Civil Procedure, [and]* '[f]utility is generally adjudicated without resort to any outside evidence.'" *Cano v. DPNY, Inc., 287 F.R.D. 251, 257 (S.D.N.Y. 2012)* (quoting *Wingate v. Gives, No. 05-CV-1872, 2009 WL 424359, at \*5 (S.D.N.Y. Feb. 13, 2009)*); see also *Sentementes v. Gen. Elec. Co., No. 14-CV-0131, 2014 WL 2881441, at \*13 (D. Conn. June 25, 2014)* (dismissing pursuant to Iqbal, but granting leave to move to reopen case and amend the complaint [*49] with supporting memorandum and proposed amended complaint). In this case, however, the Court prefers the course followed in Special Situations Fund, given that I have not authorized a change in plaintiff's theory, but merely a narrow opportunity to fix a dearth of factual specificity in the complaint by aligning it with specific sworn testimony.

In contrast, Monahan has sufficiently alleged a minimum wage claim for the week of November 14, 2011. The Court does not dismiss that claim. Thus, even if Monahan declines to further amend her pleading, she remains a party.

Finally, with respect to Anjum's allegations (which the Court has deemed sufficient) I distinguish Bustillos, 2014 WL 116012, at \*3, Boutros v. JTC Painting & Decorating Corp., No. 12-CV-7576, 2013 WL 3110943, at \*4 (S.D.N.Y. June 19, 2013), and Spiteri v. Russo, No. 12-CV-2780, 2013 WL 4806960, at \*55-56 (E.D.N.Y. Sept. 7, 2013). Like the plaintiff in Nakahata, the plaintiffs in Boutros, 2013 WL 3110943, at\* 4, and Bustillos, 2014 WL 116012, at \*3, failed to come anywhere close to the standard set forth in Lundy. The problem was not that the plaintiffs' estimates of lost time did not add up, but that they made the type of unadorned claim to have "regularly" worked overtime that Lundy rejected. Even though DeJesus made clear that estimates are not obligatory, in the absence of any additional factual context, it was impossible for the court in either case to determine whether the claims were plausible. On [*50] the other hand, the complaint in Spiteri, 2013 WL 4806960, at \*56, failed largely because the plaintiff did not even adequately allege how much he was paid, making it impossible to calculate whether he received minimum wage and overtime.

Here, the complaint provides ample detail on the wage practices at issue, rates of pay, hours worked, and estimates of unpaid hours. As the Court has explained, Anjum and Monahan's most daunting challenge comes from Lundy and its emphasis on precise arithmetic, not a lack of factual background about the wage practices at issue. But the Court has already resolved that challenge. Accordingly, the Court denies the motion to dismiss under *Rule 12(b)(6)* for failure to state a claim.

In summary, the Court has denied the *Rule 12(b)(1)* motion to dismiss for lack of a justiciable controversy, denied in part and granted in part the *Rule 12(b)(6)* motion to dismiss for failure to state a claim, and denied the motion to strike the opt-in plaintiffs.

SO ORDERED.

Dated: Brooklyn, New York

October 9, 2014

/s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE

United States District Judge